**UNITED STATES COURT OF INTERNATIONAL TRADE**

***Before*: The Honorable Stephen A. Vaden, Judge**

| | |
|---|---|
| **SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| **UNITED STATES,** | ) **Court No. 21-00049** |
| **Defendant,** | ) |
| **WHEATLAND TUBE,** | ) |
| **Defendant-Intervenor.** | ) |

**PLAINTIFF SAHA THAI'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

**June 15, 2021**

# TABLE OF CONTENTS


**INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1**

**STATEMENT OF FACTS ............................................................................ 8**

**ARGUMENT ............................................................................................ 14**

**I. WHEN COMMERCE DOES NOT USE A RESPONDENT'S OWN INFORMATION, SPECIFIC STATUTORY PROVISIONS GOVERN THE POSSIBLE APPLICATION OF ADVERSE FACTS AVAILABLE ............. 14**

**II. COMMERCE'S AD REVIEW DETERMINATION IS UNLAWFUL BECAUSE COMMERCE DID NOT COMPLY WITH THE STATUTORY REQUIREMENTS ............................................................................ 18**

**A. Commerce's Conclusion That Saha Thai's U.S. Sales Of Dual-Certified Pipe Were Necessary For The AD Margin Calculation Was Unreasonable Because It Was Directly Contrary To Commerce's Regulation and Commerce's Conclusion That Its Scope Decision Did Not Apply To The Instant AD Review ................................................... 19**

**1. Antidumping review determination are limited to imports of subject merchandise made during the review period ................ 19**

**2. Commerce's conclusion that Saha Thai's sales of dual-certified pipe were necessary for the AD margin calculation is directly contrary to Commerce's conclusion that its scope decision did not apply to import entries made during the review period ...... 21**

**B. Even If Commerce Could Permissibly Conclude That Sales Of Dual-Certified Pipe Were Necessary, Commerce Never Informed Saha Thai Of The Need For This Information and Commerce Thus Failed To Comply With 19 U.S.C. §1677m(d) ....................................................... 24**

**III. COMMERCE'S RELIANCE ON THE CBP EAPA REPORT WAS UNREASONABLE AND THEREFORE UNLAWFUL .................................. 29**

**CONCLUSION ........................................................................................ 31**

# TABLE OF AUTHORITIES

**Cases**

*Clearon Corp. v. United States*,
359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) .... 16
*Hyundai Heavy Indus. Co. v. Hyosung Corp. & Iljin Elec. Co.*,
485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) .... 17
*Jindal Poly Films Ltd. of India v. United States*,
365 F. Supp. 3d 1379 (Ct. Int'l Trade, 2019) .... 17, 18
*Shelter Forest Int'l Acquisition, Inc. v. United States*,
497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) .... 17
*Sunpreme Inc. v. United States*,
946 F.3d 1300 (Fed. Cir. 2020) .... 22
*Tai-Ao Aluminum (Taishan) Co. v. United States*,
983 F.3d 487 (Fed. Cir. 2020) .... 22
*United Steel & Fasteners, Inc. v. United States*,
203 F. Supp. 3d 1235 (Ct. Int'l Trade 2017) .... 22

**Statutes**

19 U.S.C. §1675 .... 14, 20
19 U.S.C. §1677e .... passim
19 U.S.C. §1677m .... passim

**Regulations**

19 C.F.R. §351.212 .... 20
19 C.F.R. §351.213 .... 20
19 C.F.R. §351.225 .... 22

**Administrative Determinations**

*Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 51 Fed. Reg. 8,341 (March 11, 1986) .... 1
*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, USITC Pub. 4333 at 8 (June 2012) (Third Review) .... 10
*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, USITC Pub. 4754 at I-14-16 (Jan. 2018) (Fourth Review) .... 10
*Certain Steel Threaded Rod From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 51,611 (Nov. 7, 2017) .... 21
*Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 60,910 (Oct. 13, 2000) .... 3
*Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 53,388 (Oct. 22, 2001) .... 3
*Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Oct. 20, 2004) .... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 18,001 (Apr. 25, 2018) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments, In Part; 2018-2019,* 86 Fed. Reg. 7,259 (Jan. 27, 2021) .......... 1, 6

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 61,019 (Oct. 15, 2008) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 64,696 (Oct. 20, 2010) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 61,738 (Oct. 11, 2012) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 65,272 (Oct. 31, 2013) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 64,170 (Oct. 28, 2014) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 59,732 (Oct. 2, 2015) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Notice of Final Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 54,266 (Sept. 14, 2006) .......... 3

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2018-2019, 85 Fed. Reg. 18,552 (Apr. 2, 2020) .......... 4

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018,* 84 Fed. Reg. 34,131 (July 17, 2019) .......... 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 24,743 (May 29, 2019) .......... 11

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Saha Thai Steel Pipe Public Company Limited (hereinafter, "Saha Thai") hereby submits its principal brief challenging the U. S. Department of Commerce's ("Commerce") final determination in the 2018-2019 administrative review of the antidumping duty ("AD") order concerning circular welded carbon steel pipes and tubes from Thailand. *See Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments, In Part; 2018-2019,* 86 Fed. Reg. 7,259 (Jan. 27, 2021) ("*Final Results*"), Appx10804–10806.

The Commerce determination is not supported by substantial evidence and not otherwise in accordance with law. Indeed, the Commerce determination in this case is particularly *egregious*. We recognize that this adjective may seem rather strong. But when the court views the Commerce determination in this review in the broader context of an AD order that has been in place for decades, and Saha Thai's current vigorous challenge to Commerce's scope decision concerning dual-certified pipe (*see* Court No. 20-00133), we believe the adjective applies.

The original AD order was imposed in 1986. *Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 51 Fed. Reg. 8,341 (March 11, 1986). Saha Thai participated in the original investigation and in every single active AD review since. And so, specifically, over the past two-decades, OCTAL has participated as a mandatory respondent in a Commerce AD review 13 times. This has meant that for

13 times over two decade Saha Thai has regularly participated in Commerce's annual reviews, submitted tens of thousands of pages of responses and gone through repeated strenuous verifications. In every review Saha Thai submitted complete U.S. sales data, complete home market (Thailand) sales data, and complete costs of production. Moreover, as detailed below, year after year Saha consistently obtained extremely low AD rates:

**Saha Thai AD Margins in Active Reviews for Past Twenty Years**

| **POR** | **AD Margin** | **Did Commerce utilize Saha Thai sales and cost data** |
|---|---|---|
| 1998-1999 | 1.81% | Yes |
| 1999-2000 | 1.92% | Yes |
| 2002-2003 | 0.17% | Yes |
| 2004-2005 | 2.26% | Yes |
| 2006-2007 | 4.21% | Yes |
| 2008-2009 | 2.13% | Yes |
| 2010-2011 | 0.92% | Yes |
| 2011-2012 | 0.00% | Yes |
| 2012-2013 | 0.00% | Yes |
| 2013-2014 | 0.00% | Yes |
| 2015-2016 | 0.69% | Yes |
| 2016-2017 | 0.00%[1] | Yes |
| 2017-2018 | 0.00%[2] | Yes |

(All of the above AD rates can be found in Commerce's published final AD review determinations.)[3]

---

[1] This AD rate is the revised AD rate following court remand. *See* Commerce Remand Redetermination pursuant to Slip Op. 20-181, dated March 14, 2021.

[2] This AD rate is the revised AD rate following court remand. *See* Commerce Remand Redetermination pursuant to Slip Op. 20-148, dated March 14, 2021.

[3] All of the information in this table can be found in Commerce's published AD review

Commerce initiated the 2018-2019 AD review in May 2019. Once again Saha Thai was chosen as a mandatory respondent. And once again, Saha Thai presented its U.S. prices, home market prices, and complete costs of production. Saha Thai is absolutely certain that, from a pricing and AD compliance standpoint, its actions in during the time 2018-2019 time were virtually identical to its actions during the previous years. And indeed, Commerce itself initially agreed when it rendered its preliminary determination in the underlying AD review. Based on Saha Thai's price and cost information, Commerce calculated a preliminary determination AD margin for Saha

---

determinations. *See Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 60,910 (Oct. 13, 2000) (POR 1998-1999); *Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 53,388 (Oct. 22, 2001) (POR 1999-2000); *Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Oct. 20, 2004) (POR 2002-2003); *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Notice of Final Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 54,266 (Sept. 14, 2006) (POR 2004-2005); *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 61,019 (Oct. 15, 2008) (POR 2006-2007); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 64,696 (Oct. 20, 2010) (POR 2008-2009); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 61,738 (Oct. 11, 2012) (POR 2010-2011); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 65,272 (Oct. 31, 2013) (POR 2011-2012); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 64,170 (Oct. 28, 2014) (POR 2012-2013); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 59,732 (Oct. 2, 2015) (POR 2013-2014); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 18,001 (Apr. 25, 2018) (POR 2015-2016); Commerce Remand Redetermination pursuant to Slip Op. 20-181 (POR 2016-2017); Commerce Remand Redetermination pursuant Slip Op. 20-148 (POR 2017-2018).

Thai (for the 2018-2019 time period) of 0.00%. *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2018-2019, 85 Fed. Reg. 18,552 (Apr. 2, 2020) ("*Preliminary Results*"), Appx6953–6955.

Yet, when Commerce rendered its final determination, Saha Thai's AD margin **increased from 0.00% to 37.50%.** The reason for this dramatic departure from two decades of consistently low or zero margins is that is that, for its final determination, Commerce suddenly refused to use any of Saha Thai's sales and cost data. All of Saha Thai's sales and cost data used in the preliminary determination were ignored. Instead, Commerce decided to apply "total adverse facts" available. *See Final Results*, 86 Fed. Reg. 7,259 and accompanying issues and decision memorandum at Comment 3 ("Final IDM"), Appx10788–10792. As we detail below, this Commerce's final determination is not in accordance with law and unsupported by substantial evidence.

In **Section I** we explain that, when Commerce wants to ignore all of a respondents' sales and cost data, specific statutory provisions govern the possible application of adverse facts available. Commerce does not have carte blanche to ignore respondents' information, and must instead act within a specific statutory framework. This framework is well established and has been vigorously enforced by the courts.

In **Section II** we demonstrate why Commerce's final AD review determination is unlawful because Commerce did not comply with the requirements of 19 U.S.C. §1677e and 19 U.S.C. §1677m. In particular, we demonstrate that Commerce's conclusion that Saha Thai's U.S. sales of dual-certified pipe were necessary for the AD margin

calculation was unreasonable. This conclusion was directly contrary both to Commerce's regulation and to Commerce's explicit statement that its scope decision did not apply to the instant 2018 – 2019 AD review. In addition, we also demonstrate that even if Commerce were allowed to conclude that sales of dual-certified line pipe were somehow necessary, Commerce never informed Saha Thai of this fact, never requested this information, and thus Commerce failed to comply with 19 U.S.C. §1677m(d).

Finally, in **Section III** we demonstrate why Commerce's reliance on the CBP EAPA Report to justify discarding all of Saha Thai's sales and cost data was unreasonable and therefore unlawful. Commerce never should have accepted this 11th hour submission by petitioners, long after the administrative record was closed. More importantly, Commerce never should have drawn inferences from the initiation of an investigation that had not been completed and had drawn no actual conclusions. Commerce ignored its own deadlines for submitting information, accepted allegations as facts, and imposed the drastic consequences of total adverse facts available on Saha Thai through a dumping margin that bore no relationship to reality.

## STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determinations Under Appeal

Saha Thai seeks judicial review of the Commerce's final determination in the administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Thailand (Commerce's Case No. A-549-502) for the period of review March 1, 2018, through February 28, 2019. *Final Results*, 86 Fed. Reg. 7,259, Appx10804–10806. Commerce's rationale for its final determination can be found in its "Issues and Decision Memorandum." Final IDM, Appx10778–10794.

### B. Issues of Law Presented

The relevant issues of law presented by this appeal are as follows:

- Whether Commerce's AD review determination is unlawful because Commerce did not comply with the specific statutory provisions governing use of facts available, namely 19 U.S.C. §1677e and 19 U.S.C. §1677m.
- Whether Commerce's conclusion that Saha Thai's U.S. sales of dual-certified pipe were necessary for the AD margin calculation was unreasonable because it was directly contrary to Commerce's regulation and Commerce's conclusion that its scope decision did not apply to the instant AD review.
- Whether, even if Commerce was allowed to conclude that sales of dual-certified pipe were necessary, Commerce failed to comply with 19 U.S.C. §1677m(d) because Commerce never informed Saha Thai.
- Whether Commerce's reliance on the CBP EAPA report was unreasonable and therefore unlawful.

### C. Statement of Reasons for Vacating Commerce Determinations

Commerce's AD determination should be vacated because it is not supported by substantial evidence and otherwise not in accordance with law. The reasons are set forth below.

## STATEMENT OF FACTS

Commerce's AD review determination represents an unprecedented departure from the more than two decades that Saha Thai has been subject to the AD order and undergoing regular administrative reviews. Accordingly, a proper assessment of Saha Thai's arguments challenging Commerce's final AD review determination for the 2018-2019 time period requires understanding the history of the AD order, and in particular the history of the AD Order as it pertains to the scope of the covered merchandise and as it pertains to Saha Thai.

**History of the AD Order As It Pertains To the Scope of Covered Merchandise**

Petition and original investigation

The AD case against circular welded pipe ("CWP") from Thailand began with an AD petition filed by certain U.S. producers ("the Petitioners") in February 1985. *See* Saha Thai Submission of September 25, 2020 Providing Rebuttal Factual Information at Attachment 2, Appx10618–10632.

Very soon after the original petition was filed, and indeed even before Commerce's formal initiation of the AD case, the Petitioners filed a letter that amended the scope of the petition against Thailand, by specifically excluding line pipe. *Id.* Specifically, this letter from Petitioners stated as follows:

> Petitioners in the above designated investigations . . . hereby withdraw the following portions of the followings petitions . . . A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209.

*Id.* (emphasis supplied), Appx10622.

At the time of the petition, “line pipe” of the relevant sizes was entered under Tariff Schedules of the United States Annotated (“TSUSA”) 610.2308 and 610.3209, while “standard pipe” was entered under 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. *Id.* Moreover, and very importantly, at the time of the petition – and the amendment to the petition – all dual-certified line pipe entered the United States under the same two TSUSA tariff numbers as line pipe; namely, 610.2308 and 610.3209.

The ITC original final injury determination noted that it did not consider any line pipe, including dual-certified pipe (i.e., TSUSA 610.3208 or 610.3209) as subject merchandise for purposes of injury determinations. *Id.* (*citing Original ITC Final Determination* at a-1 to a-2), Appx10622-10623.

Accordingly, the original investigation documents demonstrate unequivocally that (1) “dual-stenciled” pipe was classified under TSUSA 610.3208 and 610.3209 at the time of the petition and (2) during the original investigation Petitioner explicitly excluded from the case all pipe that entered under TSUSA 610.3208 and 610.3209. *Id*, Appx10623.

<u>USITC Sunset Reviews for Thai AD Order</u>

In the most recent sunset reviews of this AD order on circular welded steel pipes and tubes from Thailand, the ITC again made clear that dual-certified pipe is not within the scope of the order.

In the third sunset review, when providing a description of the scope of the Orders under review, the ITC stated "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders." *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, USITC Pub. 4333 at 8 (June 2012) (Third Review).

In the fourth sunset review, the ITC again noted that "{s}ince these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; <u>however, such dual-stenciled pipe is not within the scope of the subject orders</u>." *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, USITC Pub. 4754 at I-14-16 (Jan. 2018) (Fourth Review) (emphasis supplied); *see also id*. at 6-7.

**History of the AD Order As It Pertains To Saha Thai**

The original AD order was imposed in 1986. Saha Thai participated in the original investigation and in every single active Commerce AD review since. *See* past Commerce AD review determinations referenced in footnote 3.

And in ever past Commerce AD review Saha Thai provided complete U.S. sales databases and information, home market (Thailand) U.S. sales databases, and complete costs of production. Moreover, as detailed in the above summary of argument, in every single past AD review, Commerce utilized Saha Thais submitted sales and cost data to calculate Saha Thai's new AD rate.

**The Underlying Commerce AD Review for the 2018-2019 Review Period**

Commerce initiated the 2018-2019 AD review in May 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 24,743 (May 29, 2019) ("*Initiation Notice*"), Appx1073–1079. Once again, Saha Thai was chosen as a mandatory respondent, and so, once again Commerce issued its complete AD questionnaire to Saha Thai. Commerce's Questionnaire to Saha Thai Steel Pipe (Public) Company, Ltd; issued on October 21, 2019, Appx1136–1295.

Over the course of the AD review proceeding, Saha Thai submitted timely complete and certified response to each section of the Commerce questionnaire, and all supplemental questionnaires. *See* Saha Thai Responses to Questionnaire Section A (dated November 26, 2019), Appx1305-1903; Saha Thai Responses to Questionnaire Sections B & C Response (dated December 18. 2019), Appx1915-2274; Saha Thai Responses to Questionnaire Section D Response (dated December 23, 2019), Appx2280-2458; Saha Thai Responses to First Supplemental Questionnaire Response (dated March 20, 2020), Appx4502-4578; Saha Thai Responses to Second Supplemental Questionnaire Response (dated April 20, 2020), Appx6970-7083. In none of these exchanges, Commerce asked for information on dual-certified pipe

On December 18, 2019 Petitioner submitted a letter to Commerce requesting that Commerce combine its then-ongoing *scope* inquiry (concerning line pipe and dual-certified pipe) with the 2018-2019 AD review. *See* Letter on Request for Scope of Inquiry, Appx2270-2274.

On February 24, 2020 Commerce issued a letter to Petitioner rejecting Petitioner's request. Such letter stated as follows:

> Commerce does not find it practicable to combine the ongoing scope inquiry with the instant administrative review. As an initial matter, we initiated the scope inquiry on November 22, 2019. Thus, any finding that we make regarding whether line pipe or dual-stenciled standard and line pipe is covered by the scope of the order would not be effective during the period of review (*i.e.*, March 1, 2018 thorugh {sic} February 28, 2019) of the instant administrative review. Second, Commerce is not required to combine an ongoing scope inquiry and an ongoing administrative review in accordance with 19 CFR 351.225(f)(6).

*See* Commerce Letter dated February 24, 2020, Appx4414-4415. In other words, Commerce told the parties to the proceeding that the specific scope decisions about dual-certified line pipe would **not** be applied in the current review.

In April 2020 Commerce published its preliminary AD determination. *Preliminary Results*, 85 Fed. Reg. 18,552, Appx6953-6955. In its *Preliminary Results*, Commerce calculated a dumping margin of 0.00% for Saha Thai. *Id*. Commerce's AD margin for Saha Thai was premised on utilizing Saha Thai's sales and cost databases. *Id*.

On April 20, 2020 Saha Thai submitted a complete and full response to the Commerce's *second* supplemental questionnaire dated March 23, 2020. Following receipt of Saha Thai's second supplemental questionnaire response, Commerce did not ask Saha Thai for any additional information or data.

In the *Final Results*, Commerce completely discarded all of the sales and cost databases submitted by Saha Thai, and upon which Commerce had rendered its preliminary determination, and instead imposed a margin based on full adverse facts

available. The final AD rate imposed by Commerce for Saha Thai was 37.5%. *See Final Results*, 86 Fed. Reg. at 7,260, Appx10805.

## ARGUMENT

### I. WHEN COMMERCE DOES NOT USE A RESPONDENT'S OWN INFORMATION, SPECIFIC STATUTORY PROVISIONS GOVERN THE POSSIBLE APPLICATION OF ADVERSE FACTS AVAILABLE

The purpose of a Commerce AD proceeding is to use a respondent's information to calculate a dumping margin for that respondent using that party's own information. In the context of an administrative review, Commerce calculates a new AD rate for the foreign producer-exporter for whom an AD review was requested and to calculated final AD assessment for the import entries made during the review period. Pursuant to the statute and long-standing Commerce practice, Commerce's calculation of a new AD review rate (for a mandatory respondent such as Saha Thai) is based on specific sales and cost data submitted by the producer-exporter. This is the very reason that, in every AD review, Commerce sends to the producer-exporter an extremely detailed questionnaire seeking both general information and U.S. sales transaction data, home market sales transaction data and costs of production. Commerce then uses all of this submitted U.S. sales transaction, home market sales transaction, and cost data to calculate a new AD rate for the producer-exporter based on that information. *See* 19 U.S.C. §1675(a)(2)(A) (directing Commerce to calculate normal value for each entry of every known exporter and calculate a dumping margin for each of those entries).

Again, the law and long-standing Commerce practice require Commerce to use the sales and cost data submitted by the producer exporter to calculate the new AD review rate. That stated, the statute recognizes that there may be instances in which Commerce believes that certain data needed for the AD margin calculation is not available.

Accordingly, the statute contains specific provisions governing how Commerce should address these instances. Such instances are referred to as Commerce using "facts available" in the calculation of the AD margin—that is, Commerce relying on facts otherwise available (rather than relying solely on the producer-exporter's submitted data) to calculate the AD margin. The use of "facts available" is governed by 19 U.S.C. §1677e and 19 U.S.C. §1677m(d).

As we detail below, Commerce's final AD review determination does not comply these statutory provisions.

19 U.S.C. §1677e is titled "Determinations on basis of facts available" and provides in relevant part as follows:

> (a) In general
>
> If—
>
> (1) necessary information is not available on the record, or
>
> (2) an interested party or any other person—
>
> > (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
> >
> > (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
> >
> > (C) significantly impedes a proceeding under this subtitle, or
> >
> > (D)provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>
> the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. §1677e (emphasis supplied). As noted by the highlighted text, Commerce's use of facts available is explicitly conditioned on two key elements that are relevant for this case.

First, the information must be "necessary." Commerce cannot apply facts available because any information might be missing. That information must be "necessary" and Commerce has to be able to show the information is "necessary" for the AD review margin calculation. *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1357-58 (Ct. Int'l Trade 2019) ("Commerce must resort to facts available only when 'necessary information is not available on the record,' or an interested party withholds information or significantly impedes a proceeding."). In addition, Commerce must have the authority to apply facts available before deploying an adverse inference.
19 U.S.C. §1677e(b)(1).

Second, Commerce must provide notice. The statute expressly conditions the use of adverse facts available on Commerce's compliance with 19 U.S.C. §1677m(d).
19 U.S.C. §1677m(d) is titled "Deficient submissions" and provides as follows:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. §1677m(d). (emphasis supplied)

The above statutory language is clear. When conducting its AD proceedings, should Commerce believe that the data submitted by the respondent is not sufficient in some respect for Commerce's purposes, <u>Commerce has an affirmative obligation to notify the respondent</u> of the nature of the perceived deficiency and provide an opportunity for the respondent to remedy the perceived deficiency.

Beyond this statutory language that is clear on its face, repeated court precedent has held unlawful a Commerce AD determination applying adverse facts available when Commerce has not complied with the affirmative obligation set forth in 19 U.S.C. §1677m(d). *See e.g Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379 (Ct. Int'l Trade, 2019); *Hyundai Heavy Indus. Co. v. Hyosung Corp. & Iljin Elec. Co*., 485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020); *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021).

We respectfully submit that *Jindal Poly* and *Shelter Forest* are particularly instructive. In those cases, like here, the respondent submitted data and information to Commerce fully believing that the submitted data and information fully satisfied Commerce's requirements. The respondents were then surprised when they learned—only in Commerce's determination—that their belief was not correct and that Commerce apparently thought it needed something else. On appeal the court ruled that it was Commerce who was at fault. *See Jindal Poly*, *supra* and *Shelter Forest*, *supra*. Indeed, the court in *Jindal Poly*, after noting Commerce's statutory obligation set forth in 19 U.S.C. §1677m, explicitly commented that "Commerce was the only party that could have been aware of the deficiency in the questionnaire response because it was the only

participant in the review that knew what would satisfy its unarticulated criteria." *Jindal Poly*, 365 F. Supp. 3d at 1388.

As we detail below, in the instant case, Commerce likewise did not comply with the statute. Commerce never told Saha Thai it needed certain information and instead shocked Saha Thai with an entirely new rationale that had no proper basis in the review at issue. Commerce's determination is therefore contrary to law.

## II. COMMERCE'S AD REVIEW DETERMINATION IS UNLAWFUL BECAUSE COMMERCE DID NOT COMPLY WITH THE STATUTORY REQUIREMENTS

Commerce's determination ignored two specific statutory requirements for imposing adverse facts available.

First, Commerce made a finding that certain information was "necessary," even though such finding runs counter to both the normal statutory framework and to Commerce's own specific finding in this case. Having earlier told the parties that the ongoing scope review as not relevant at all the ongoing review, Commerce then at the last moment unilaterally deemed that same irrelevant information to now be "necessary" and imposed facts available on that basis. Doing so was contrary to the requirement of 19 U.S.C. §1677e.

Second, Commerce also never asked Saha Thai for this information. The scope of the order had been clear for decades. Commerce never asked for U.S. sales data of dual-certified pipe in the past and did not ask for such information in this particular review. Commerce did not ask for this information, even after petitioners raised their issues with scope of the order. Yet notwithstanding have never asked for this information,

Commerce decided at the last moment to punish Saha Thai for not providing this information. Doing so was contrary to the requirement of 19 U.S.C. §1677m(d).

### A. Commerce's Conclusion That Saha Thai's U.S. Sales Of Dual-Certified Pipe Were Necessary For The AD Margin Calculation Was Unreasonable Because It Was Directly Contrary To Commerce's Regulation and Commerce's Conclusion That Its Scope Decision Did Not Apply To The Instant AD Review

#### 1. Antidumping review determination are limited to imports of subject merchandise made during the review period

The purpose of antidumping administrative reviews differs from that of original antidumping investigations. Original antidumping investigations seek to determine antidumping cash deposit amounts for all exporters of subject merchandise from the targeted country. In contrast, antidumping administrative reviews seek to determine final antidumping liability for particular import entries of subject merchandise during the review period.

This fundamental distinction is reflected in the explicit statutory language governing antidumping administrative reviews. The statute expressly limits the scope and conduct of an administrative review to the review of entries of subject merchandise during the relevant period of review:

> For the purpose of {an antidumping administrative review under 19 U.S.C. §1675(a)(1)(B)}, the administrative authority shall determine –
>
> (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and
>
> (ii) the dumping margin for each such entry.

19 U.S.C. §1675(a)(2)(A) (emphasis supplied). The statute thus expressly focuses Commerce on actual import entries of subject merchandise made during the review period, and not on other transactions that are not part of the review.

Commerce's implementing regulations reflect the same distinction. As Commerce itself explains in its regulations:

> Unlike the systems of some other countries, the United States uses a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time.

19 C.F.R. §351.212(a) (emphasis supplied).

> {T}he most frequently used procedure for determining final duty liability is the administrative review procedure under section 751(a)(1) of the Act.

19 C.F.R. §351.213(a) (emphasis supplied).

This distinction means that the existence of import entries of subject merchandise during the applicable review period defines the scope of the antidumping administrative review. Indeed, Commerce has a practice of only including in the antidumping margin calculation those U.S. sales of import entries of subject merchandise made during the review period. *See, e.g., Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018,* 84 Fed. Reg. 34,131 (July 17, 2019), and accompanying Preliminary Decision Mem. at 3;[4] *Certain Steel Threaded Rod From the People's Republic of China: Final Results of Antidumping Duty Administrative*

---

[4] Available at https://enforcement.trade.gov/frn/summary/japan/2019-15192-1.pdf (accessed on June 26, 2020).

*Review; 2015-2016*, 82 Fed. Reg. 51,611 (Nov. 7, 2017), and accompanying I&D Mem. at 11 ("The purpose of the administrative review is to assess antidumping duties for the entries during the POR. Therefore, the preferred approach to define U.S. sales which will be included in the Department's dumping analysis is to include those sales associated with the entries of subject merchandise during the POR.") (emphasis supplied).[5]

This understanding of the limited purposed of the AD review – to determine the specific AD liability just for import entries of subject merchandise made during the review period – is important for understanding why Commerce's AD review determination is unlawful. As detailed below, Commerce wrongly concluded that the Saha Thai's sales of dual-certified pipe were necessary for calculating a new AD rate for subject merchandise during this review period.

**2. Commerce's conclusion that Saha Thai's sales of dual-certified pipe were necessary for the AD margin calculation is directly contrary to Commerce's conclusion that its scope decision did not apply to import entries made during the review period**

As detailed above, the purpose of Commerce's AD review in the instant case was to calculate a new AD rate for Saha Thai's import entries of subject merchandise made during the particular review period. In the AD review at issue the applicable "period of review" was March 1, 2018 – February 28, 2019. *See Initiation Notice*, 84 Fed. Reg. 24,743, Appx1073–1079; *Final Results*, 86 Fed. Reg. at 7,260, Appx10804–10806.

Commerce's final decision that Saha Thai impeded the AD review is directly premised upon Commerce's incorrect factual conclusion that Saha Thai's sales of dual-

[5] Available at https://enforcement.trade.gov/frn/summary/prc/2017-24178-1.pdf (accessed on June 26, 2020).

certified pipe were somehow necessary for Commerce to calculate actual AD liability for the import entries subject to the AD review (that is, the import entries made during the time period March 1, 2018 – February 28, 2019. However, this factual conclusion is demonstrably wrong, as a matter of law, because Commerce's conclusion that "subject merchandise"—that is merchandise subject to AD duties includes dual-certified pipe did not apply to import entries made before November 2019.

This legal conclusion is evident from multiple sources. First and foremost, Commerce has a specific regulation that makes explicit that the effective date of Commerce scope decision is "the date of initiation of the scope inquiry." *See* 19 C.F.R. §351.225(l). Since the scope inquiry here was initiated in November 2019, the conclusion from that scope inquiry cannot go back in time.

Second, there is substantial court precedent that the effective date for a Commerce scope decision is the date of initiation; meaning that the scope decision does not apply import entries prior to the date of initiation. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1320 (Fed. Cir. 2020) (holding that pre-initiation suspension of liquidation where section 351.225(l)(3) applies "would be impermissibly retroactive."); *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 494 (Fed. Cir. 2020) (noting that the notice and retroactivity rules laid down in 19 CFR 351.225(l) are designed to "avoid unfairness to importers and foreign exporters."); *United Steel & Fasteners, Inc. v. United States*, 203 F. Supp. 3d 1235, 1250 (Ct. Int'l Trade 2017) ("Commerce instead substantially limited the temporal reach of an affirmative scope ruling by promulgating these limitations on the suspension of liquidation in its regulations. Thus, the regulatory history highlights the

fact that Commerce did not intend to apply an order suspending liquidation retroactively in a scope proceeding at the time the governing regulations were promulgated.”).

Third, in the very AD review proceeding at issue, Commerce explicitly stated that its scope decision (finding that dual-certified pipes were “subject merchandise” for the circular welded pipe antidumping case) would not apply to the 2018-2019 AD review. Commerce made this explicit statement because Petitioner had requested Commerce to make its then-ongoing (separate) scope inquiry ruling part of the ongoing 2018-2019 AD review. Letter on Request for Scope of Inquiry, Appx2270–2274. In response to Petitioner’s request, Commerce issued a letter to Petitioner’s counsel dated February 24, 2020. Commerce Letter dated February 24, 2020, Appx4421–4422. Commerce’s letter stated the following:

> I am writing in response to your letter of December 18, 2019, on behalf of Wheatland Tube (Wheatland), requesting that the Department of Commerce (Commerce) conduct the scope inquiry on line pipe and dual-stenciled standard and line pipe in conjunction with the instant administrative review of circular welded carbon steel pipes and tubes (pipes and tubes) from Thailand.[1] On December 30, 2019, Saha Thai Steel Pipe Public Co., Ltd. (Saha Thai) filed its objection to Wheatland’s request.[2]
>
> Commerce does not find it practicable to combine the ongoing scope inquiry with the instant administrative review. As an initial matter, we initiated the scope inquiry on November 22, 2019. Thus, any finding that we make regarding whether line pipe or dual-stenciled standard and line pipe is covered by the scope of the order would not be effective during the period of review (*i.e.*, March 1, 2018 through February 28, 2019) of the instant administrative review

Commerce Letter dated February 24, 2020 (emphasis supplied), Appx4421–4422.

This statement of its position could not be more clear. Commerce was rendering a legal conclusion—and informing the parties—that even should Commerce ultimately conclude

that scope of the CWP AD case include dual-certified pie (which it ultimately did),[6] such scope ruling would not apply to import entries made during the March 2018 – February 2019 AD review period. Accordingly, the scope ruling had no applicability for the AD review.

Given this explicit Commerce finding during the very AD review at issue, Commerce's final determination that Saha Thai's U.S. sales of dual-certified pipes were necessary for Commerce's calculation of Saha Thai's AD margin for the review period is unreasonable and therefore unlawful.

### B. Even If Commerce Could Permissibly Conclude That Sales Of Dual-Certified Pipe Were Necessary, Commerce Never Informed Saha Thai Of The Need For This Information and Commerce Thus Failed To Comply With 19 U.S.C. §1677m(d)

Commerce's scope conclusion that dual-certified pipe was included in the scope of the CWP AD case did not apply to import entries made before November 2019 and therefore, as a matter of law, Commerce had no authority to include sales of dual-certified pipe in its AD margin calculation for the March 2018 – February 2019 AD review period. Even should this Court disagree and instead find that Commerce was allowed to change its mind about the need for Saha Thai's sales of dual-certified pipe, Commerce was required to inform Saha Thai of this change in position and specifically ask for the dual-certified sales data.

---

[6] We note that Saha Thai vigorously disputes the lawfulness of Commerce's scope decision. *See* Court No. 20-00133.

As detailed above, pursuant to 19 U.S.C. §1677m(d), Commerce has a statutory obligation to inform respondents if there are any deficiencies in the data and information provided. In the AD review at issue, vis-à-vis U.S. sales of dual-certified pipe, there can be no dispute that Commerce ignored this statutory obligation. The underlying administrative record makes clear that Commerce never informed Saha Thai that Commerce wanted Saha Thai to submit its U.S. sales of dual-certified line pipe despite the fact that Saha Thai made clear that it was not providing data related to sales of dual-certified line pipe.

Specifically, on November 26, 2019 Saha Thai submitted its response to Section A of the Commerce AD questionnaire. Saha Thai Responses to Questionnaire Section A (dated November 26, 2019), Appx1311–1903. Question 1 a. of Commerce's Section A questionnaire instructed Saha Thai to "state the total quantity and value of merchandise under review that you sold during the period of review (POR) in or to . . . the United States." Commerce's Questionnaire to Saha Thai Steel Pipe (Public) Company, Ltd; issued on October 21, 2019 at A-1 (emphasis supplied), Appx1153. In response to this question, Saha Thai provided as follows:

> "The {requested} volume and value chart is provided in Exhibit A-1." {footnote}
>
> {content of footnote}
>
> "Saha Thai has reported subject merchandise and foreign like product as standard pipe. During the POR, Saha Thai also sold API 5L pipes ("Line Pipe"). Based on the scope of this administrative review and the Department's practice, these products have not been reported as subject merchandise. Petitioner has claimed that Line Pipe is included within the scope of the Order on standard pipe from Thailand. The Department has initiated a scope inquiry to determine whether Line Pipe is subject

> merchandise. See Letter from the Department entitled, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe," dated July 29, 2019. However, as of the date of the filing of this response, the Department has not determined whether Line Pipe is included within the scope of this administrative review. Thus, Saha Thai has only reported standard pipe in its volume and value of subject merchandise and foreign like product.

Saha Thai Responses to Questionnaire Section A (dated November 26, 2019), page 3, fn. 3 (emphasis supplied), Appx1314.

On December 18, 2019 Saha Thai submitted its complete U.S. sales database on December 18, 2019. Saha Thai Responses to Questionnaire Section C Response (dated December 18. 2019), Appx2058–2269. Accompanying the submission of the Saha Thai's complete U.S. sales database was a narrative "Section C Questionnaire Response" in which Saha Thai provided answers to all questions that Commerce had set forth in Section C of Commerce's AD questionnaire. *Id.* at Exhibit C-1, Appx2116-2131. This Saha Thai Section C questionnaire response made clear that Saha Thai had undertaken the same process for compiling its U.S. sales database as Saha Thai had done in previous AD reviews. Fundamentally, Saha Thai's Section C questionnaire response showed that Saha Thai was reporting U.S. sales of the same type of circular welded standard type that Saha Thai had done in previous AD reviews.

On March 6, 2020 Commerce issued its "first supplemental questionnaire" to Saha Thai. First Supplemental Questionnaire in the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand, dated March 6, 2020, Appx4465–4467. The cover letter to the Commerce supplemental questionnaire stated as follows:

> This letter concerns the antidumping duty administrative review of circular welded steel pipes and tubes from Thailand and your client, Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai). The Department of Commerce (Commerce) has identified certain areas of your questionnaire responses and databases that require additional information.

*Id.*, Appx4465. Attached to the cover letter was a single page that set forth specific questions and instructions for Saha Thai to complete in a supplemental questionnaire response. All of the questions concerned Saha Thai's cost of production information that Saha Thai submitted in its Section D response. *Id.* at Attachment, Appx4467. This supplemental questionnaire did not contain any indication to Saha Thai that Saha Thai was to provide a new U.S. sales database containing Saha Thai's U.S. sales of dual-certified line pipe, or cost of production data related to those sales. Saha Thai provided a complete response to Commerce's first supplemental questionnaire on March 20, 2020. Saha Thai Responses to First Supplemental Questionnaire Response (dated March 20, 2020), Appx4507–4578.

On March 23, 2020 Commerce issued its "second supplemental questionnaire" to Saha Thai. Second Supplemental Questionnaire in the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand, dated March 23, 2020, Appx4579–4583. Similar to Commerce's first supplemental questionnaire, the cover letter to Commerce's second supplemental questionnaire stated as follows:

> This letter concerns the antidumping duty administrative review of circular welded steel pipes and tubes from Thailand and your client, Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai). The Department of Commerce (Commerce) has identified certain areas of your questionnaire responses and databases that require additional information.

*Id.*, Appx4579. Attached to the cover letter was an Attachment with three pages of questions and requests for information and data. *Id.*, Appx4581-4583. Although Commerce's second supplemental questionnaire did ask Saha Thai to provide some additional information about its sales of "non-subject merchandise," Commerce's second supplemental questionnaire did not contain any indication to Saha Thai that Saha Thai was to provide a new U.S. sales database containing Saha Thai's U.S. sales of dual-certified line pipe. *Id.*, Appx4579–4583. Saha Thai provided a complete response to Commerce's first supplemental questionnaire on April, 2020.

Commerce did not make any further requests of Saha Thai for the remainder of the AD review. And so, again, the underlying administrative record makes clear that Commerce never informed Saha Thai that Commerce wanted Saha Thai to submit its U.S. sales of dual-certified line pipe.

Moreover, given Commerce's letter of February 2020 in which Commerce itself explicitly stated during the review period that the dual-certified scope decision would not apply to import entries made during the March 2018 – February 2019 review period, there is zero basis to conclude that Saha Thai "should have known" that it was required to include its sales of dual-certified line pipe in its U.S. sales database.

In sum, the administrative record leave no doubt that (a) Commerce never requested that Saha Thai provide its sales of dual-certified line pipe and (b) there is no basis to conclude that Saha Thai should have known to provide these sales of dual-certified line pipe. And therefore, given the undisputed evidentiary record, Commerce's conclusion to apply adverse facts available was contrary to the statute.

## III. COMMERCE'S RELIANCE ON THE CBP EAPA REPORT WAS UNREASONABLE AND THEREFORE UNLAWFUL

As noted above, in the underlying AD review, Commerce's preliminary determination calculated a new AD rate for Saha Thai of 0.00% using Saha Thai's submitted sales and cost databases. The evidentiary record also confirms that Saha Thai did not submit any new sales or cost databases after Commerce's preliminary determination. And yet, Commerce's final determination imposed an AD rate of 37.5% based on a decision to completely ignore all of Saha Thai's submitted sales and cost databases. According to Commerce's I&D Memorandum, its decision to ignore all of Saha Thai's submitted sales and cost databases rested on the so-called CBP EAPA report. Final IDM at 5, Appx10782. Commerce's reliance on this CPB EAPA report was unreasonable and therefore unlawful.

Of critical importance is that the CBP EAPA Report is effectively only a notice of initiation, not any official findings. Specifically, the report at issue here was a notice of initiation by U.S. Customs and Border Protection ("CBP")'s Trade Remedy Law Enforcement Directorate to investigate whether Blue Pipe—a U.S. importer completely unaffiliated to Saha Thai—imported standard pipe that was incorrectly marked as line pipe to avoid the AD order. Such CBP notice of initiation proves absolutely nothing as to the accuracy of the sales and cost data that Saha Thai had provided in the instant AD review.

Moreover, the EAPA investigation in and of itself is not a determination of wrongdoing. Instead, CBP only determines that the evidentiary threshold to initiate the EAPA investigation has been met.

In addition, whether or not CBP concludes that Blue Pipe—again, an unaffiliated company from Saha Thai—did or did not "evade" the AD order by marking standard pipe as line pipe is a question under CBP's EAPA jurisdiction that is not relevant to Commerce's ongoing administrative review. Therefore, CBP's notice of an EAPA initiation against Blue Pipe was not relevant to Commerce's administrative review of Saha Thai. And, therefore, it was unreasonable, and therefore unlawful, for Commerce to rely on the CBP EAPA Report to throw out all of Saha Thai's sales and cost databases for purposes of calculating a new AD rate for Saha Thai.

## CONCLUSION

For all of the foregoing reasons, Saha Thai respectfully requests that the Court holds unlawful Commerce's final determination rendered in the underlying administrative review and remand with instructions for Commerce to reissue its AD review determination consistent with the Court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiff Saha Thai Steel Pipe Public Company Limited*

June 15, 2021

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 7,177 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel for Plaintiff Saha Thai Steel Pipe Public Company Limited*