A-549-502<br>
Remand<br>
Slip. Op. 22-134<br>
POR: 3/1/2018 – 2/28/2019<br>
**Public Document**<br>
E&C/OVII: TC

*PT. Saha Thai Steel Pipe Public Co., Ltd., v. United States*,
605 F. Supp. 3d 1348 (CIT 2022)
*Circular Welded Carbon Steel Pipes and Tubes*

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) issued on December 2, 2022.[1] These final results of redetermination concern Commerce's final results in the administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Thailand, covering the period March 1, 2018, through February 28, 2019.[2]

Consistent with the Court's *Remand Order*, Commerce reconsidered its *Final Results* by first issuing a complete questionnaire to Saha Thai Steel Pipe Public Co., Ltd. (Saha Thai), instructing Saha Thai to provide a revised questionnaire response that includes all details of sales of dual-stenciled pipe, pursuant to Commerce's scope ruling and the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) decision in *Saha Thai Steel Pipe Pub. Co. v. United States,* 101 F.4th 1310 (Fed. Circ. 2024). Commerce then calculated a weighted-average dumping

---

[1] *See Saha Thai Steel Pipe Public Co., Ltd., v. United States,* 605 F. Supp. 3d 1348 (CIT 2022) (*Remand Order*).
[2] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments, In Part; 2018-2019,* 86 FR 7259 (January 27, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 FR 8341 (March 11, 1986) (*Order*).

margin based on the revised response from Saha Thai and determined that the weighted-average dumping margin for Saha Thai is now 0.00 percent for this period of review (POR).[3]

**II.     BACKGROUND**

In the *Final Results*, Commerce found that Saha Thai did not provide requested information with respect to a substantial portion of its U.S. sales and failed to act to the best of its ability.[4] As a result, Commerce reached its final determination based on facts otherwise available, including the application of adverse inferences (AFA).[5] Specifically, Commerce cited U.S. Customs and Border Protection's (CBP) Enforce and Protect Act Final Determination, in which CBP found that Blue Pipe Steel Center Company Limited (Blue Pipe) as the U.S. importer of record had evaded the *Order* by not declaring its entries of dual-stenciled standard pipe and line pipe as subject merchandise.[6] CBP also stated that the dual-stenciled pipe had been produced by Saha Thai.[7] Since Commerce found on June 30, 2020, that dual-stenciled standard pipe and line pipe was subject to the *Order* through a scope inquiry, Commerce explained in the *Final Results* that Saha Thai was aware that sales of dual-stenciled pipe should be reported to Commerce for the purposes of the 2018-2019 administrative review, but failed to report sales of dual-stenciled pipe.[8] Therefore, Commerce applied total AFA to Saha Thai based on its failure to act to the best of its ability by not reporting a substantial portion of its sales of subject merchandise.

---

[3] *See* Memorandum, "Analysis Memorandum for the Draft Remand Redetermination of the Antidumping Duty Administrative Review of Circular Welded Pipe and Tubes from Thailand:  Saha Thai Steel Pipe Public Co., Ltd.," dated July 7, 2025.
[4] *See Final Results* IDM.
[5] *Id.*
[6] *Id* at 4-5.
[7] *Id.* at 5.
[8] *Id.* at 5; *see also* Saha Thai's Letter, "Saha Thai's Request for Rejection of Petitioner's September 18, 2020 NFI and To Accept Rebuttal Factual Information," dated September 25, 2020 at Attachment I.

Saha Thai challenged Commerce's decision to apply adverse inferences drawn from facts otherwise available and the resulting weighted-average dumping margin before the Court. The Court subsequently held that Commerce had failed to provide notice to Saha Thai of the deficiencies in the information submitted to Commerce and an opportunity to remedy such deficiency as required by law, and that Commerce had also failed to explain adequately in the record the reason that it chose to draw an adverse inference.[9] The Court found that Commerce's decision was not supported by substantial evidence or in accordance with the law and remanded the issue to Commerce for further proceedings.[10] The litigation was later stayed pending the final and conclusive disposition of *Saha Thai Steel Pipe Pub. Co. v. United States,* 101 F.4th 1310 (Fed. Circ. 2024), including Saha Thai's petition for writ of certiorari to the United States Supreme Court.

On July 8, 2025, Commerce released its draft results of redetermination, draft calculation memorandum, and draft customs instructions to interested parties for comment.[11] No interested parties commented on the Draft Redetermination.

## III. ANALYSIS

As discussed *supra,* the Court held in the *Remand Order* that Commerce's decision to apply AFA to Saha Thai was not supported by substantial evidence or in accordance with the law. Therefore, following the *Remand Order*, Commerce reopened the record of the administrative review and solicited a full revised questionnaire response from Saha Thai in order to obtain the information necessary to accurately calculate Saha Thai's weighted-average

---

[9] *See Remand Order.*
[10] *Id.*
[11] *See* Draft Results of Remand Redetermination, *Saha Thai Steel Pipe Public Co., Ltd., v. United States,* 605 F. Supp. 3d 1348 (CIT 2022), dated July 7, 2025 (Draft Redetermination); *see also* Memorandum, "Analysis Memorandum for the Draft Remand Redetermination of the Antidumping Duty Administrative Review of Circular Welded Pipe and Tubes from Thailand: Saha Thai Steel Pipe Public Co., Ltd.," dated July 7, 2025; *see also* Memorandum, "Draft Liquidation Instructions for Final Remand Redetermination," dated July 8, 2025.

dumping margin.[12] In that questionnaire, Commerce instructed Saha Thai to provide "all details of the sales of dual-stenciled pipe that also fit the description of the products under review…"[13] On May 23, 2025, Commerce issued a supplemental questionnaire to Saha Thai to which Saha Thai timely responded.[14] Based on Saha Thai's response to sections A through D of the Revised Initial Questionnaire and its supplemental questionnaire response,[15] Commerce has calculated a revised weighted-average dumping margin in accordance with the methodology described in the *Preliminary Results*. Additionally, because Commerce did not address a particular market situation (PMS) allegation filed by Wheatland Tube Company (Wheatland) in the *Preliminary Results*, Commerce has addressed the PMS allegation for this remand redetermination.[16] Commerce's analysis of Wheatland's PMS allegation and the subsequent adjustments made as a result of Commerce's PMS finding are discussed *infra*.

On January 21, 2020, Wheatland filed an allegation that a PMS existed in Thailand during the POR with respect to hot-rolled coil (HRC), the largest input used to produce circular welded pipe (CWP), such that the costs of production of CWP are distorted and do not accurately reflect the costs of production in the ordinary course of trade.[17] As a result, Wheatland argues, Commerce should apply an upward adjustment to Saha Thai's purchase costs of HRC in

---

[12] *See* Commerce's Letter, "Request for Information," dated August 30, 2024 (Revised Initial Questionnaire).
[13] *Id.* at 1.
[14] *See* Commerce's Letter, "Supplemental Questionnaire," dated May 22, 2025; *see also* Saha Thai's Letter, "Saha Thai's Supplemental Questionnaire Response," dated June 5, 2025.
[15] *See* Saha Thai's Letter, "Saha Thai's Section A Questionnaire Response," dated March 12, 2025; *see also* Saha Thai's Letter, "Saha Thai's Section B Questionnaire Response," dated March 24, 2025; *see also* Saha Thai's Letter, "Saha Thai's Section C Questionnaire Response," dated March 24, 2025; *see also* Saha Thai's Letter, "Saha Thai's Section D Questionnaire Response," dated March 24, 2025; *see also Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018-2019,* 85 FR 18552 (April 2, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[16] *See* Wheatland's Letter, "Particular Market Situation Allegation and Supporting Factual Information – Qualitative Submission," dated January 21, 2020 (Qualitative Submission); *see also* Wheatland's Letter, "Particular Market Situation Allegation and Supporting Factual Information – Quantitative Submission," dated January 21, 2020 (Quantitative Submission) (collectively, PMS Allegation).
[17] *See* PMS Allegation.

4

calculating its weighted-average dumping margin.[18]  Wheatland states that Commerce has relied on these same factors enumerated in its PMS Allegation in previous determinations in this proceeding, *i.e.*, global steel overcapacity, Government of Thailand (GOT) subsidies to HRC producers, dumping of HRC in the Thai market, and import duty exemptions for Thai CWP producers.[19]  Wheatland argues that these same factors exist for the current POR.  On March 31, 2020, Saha Thai submitted its rebuttal to Wheatland's PMS Allegation.[20]

In the *Preliminary Results,* Commerce stated that "{b}ecause of the timing of this allegation, we have not made a determination of whether a cost-based PMS existed during the POR for these preliminary results.  We intend to consider this allegation further prior to the final results."[21]  As explained above, however, Commerce relied on AFA in the *Final Results* and therefore Commerce did not address Wheatland's PMS Allegation in the *Final Results.*  Since Commerce is now calculating a weighted-average dumping margin for Saha Thai pursuant to the *Remand Order*, Commerce is addressing Wheatland's PMS Allegation for this remand redetermination and the various arguments raised by parties in the underlying administrative review prior to this litigation.

In its PMS Allegation, Wheatland first argues that Thai producers of HRC are subsidized by the GOT, which enables them to sell HRC at below-market prices to producers of CWP.[22]  Wheatland argues that these subsidies distort prices for all HRC sold in the Thai market, because imported HRC is sold in competition with domestic subsidized HRC.[23]  Second, Wheatland argues that prices of imports of HRC into Thailand are distorted by dumping, subsidization, and

---

[18] *Id*.
[19] *See* Qualitative Submission at 3-4.
[20] *See* Saha Thai's Letter, "Saha Thai's Rebuttal Comments on Particular Market Situation Allegation," dated March 31, 2020 (Saha Thai's Rebuttal).
[21] *See Preliminary Results* PDM at 5.
[22] *See* Qualitative Submission at 5.
[23] *Id*.

5

global overcapacity.[24] Wheatland argues that global overcapacity "drove such a large surge of HRC into the Thai market at such injuriously low prices that" the GOT has imposed AD orders on HRC from various countries, as well as global safeguards on non-alloy and alloy HRC imports.[25] Wheatland states that these AD orders and safeguard measures were in place during the POR.[26] Moreover, Wheatland argues that U.S. countervailing duty (CVD) orders on HRC from various countries demonstrate that HRC producers that export to Thailand are also subsidized.[27] Wheatland also argues, however, that Thai producers of CWP did not pay any AD, CVD, or safeguard duties on imports of HRC used to produce CWP, and therefore none of the dumping, subsidies, or global overcapacity were offset in the cost of production of CWP for export to the United States.[28] Therefore, Wheatland argues that a PMS exists with respect to HRC, because these factors contribute to distort the entire Thai market for HRC.[29] Saha Thai objects to Wheatland's PMS Allegation on the grounds that Commerce does not have the authority to make a PMS adjustment for the purposes of the sales-below-cost test, that the PMS provisions are reserved for extraordinary situations, that Commerce cannot find a PMS based on global circumstances, and that Commerce must empirically analyze the PMS allegation with respect to actual costs.[30] Second, Saha Thai rebuts Wheatland's factual arguments by arguing that record evidence demonstrates that overcapacity globally, and in China, did not cause a PMS in Thailand during the POR, that Thai AD and safeguard duties do not create a PMS for this POR, and that the record does not support that the GOT subsidizes HRC producers in Thailand.[31]

---

[24] *Id.* at 6.
[25] *Id.*
[26] *See* Qualitative Submission at 6.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *See* Saha Thai's Rebuttal.
[31] *Id.*

Section 504 of the Trade Preferences Extension Act of 2015 added the concept of "particular market situation" in the definition of the term "ordinary course of trade," for purposes of constructed value (CV) under section 773(e), and through these provisions for purposes of the cost of production (COP) under section 773(b)(3).[32]  Section 773(e) states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."

Wheatland argues that the same factors (*i.e.*, global steel overcapacity, HRC subsidization by the GOT, HRC dumping in the Thai market, and import duty exemptions for Thai CWP producers) and their effects that contributed to Commerce's determination that a PMS existed with respect to the Thai HRC market in previous reviews are still present in this POR. Saha Thai argues that the relevant factors have changed for this POR.

The record shows that Commerce has found that the GOT subsidizes all Thai HRC producers.[33]  In addition, Commerce has continued to find in recent sunset reviews of the *HRC from Thailand CVD Order* that imports of HRC from Thailand into the United States remain subject to a CVD rate of 2.38 percent.[34]  Saha Thai argues that the 2.38 percent *ad valorem* subsidy rate is outdated, but in the sunset review most recently completed as of the POR of this

---

[32] *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).
[33] *See Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001) (*HRC from Thailand CVD Order*).
[34] *See Certain Hot-Rolled Carbon Steel Flat Products from India, Indonesia, and Thailand:  Final Results of Expedited Sunset Reviews,* 78 FR 16252 (March 14, 2014) (*2014 Sunset Review*); *see also Certain Hot-Rolled Carbon Steel Flat Products from Thailand:  Final Results of the Third Expedited Five Year (Sunset) Review of the Countervailing Duty Order,* 84 FR 27085 (June 11, 2019).

7

administrative review (and in subsequent sunset reviews), Commerce found that countervailable subsidies would be likely to continue or recur in the event that the CVD order were revoked.[35]

Saha Thai cites to data that it claims shows that the steel overcapacity situation has significantly improved in recent years, especially in China.[36] While the record evidence submitted by Saha Thai does show that Chinese excess capacity has declined between 2015 and 2017, the data show that Chinese excess capacity remained at over 216 million metric tons in 2017, accounting for well over a third of total global excess capacity (*i.e.,* 560 million metric tons).[37] Additionally, although Saha Thai claims that the data it submitted demonstrate that Chinese steel did not flood the world market, the information submitted by Wheatland from Commerce's Global Steel Trade Monitor shows that Thai imports of steel from China increased between 2017 and 2018.[38] Finally, Wheatland argues that consistent import average unit values (AUVs) are the best metric to capture the overall dynamics of an individual steel market.[39] An analysis of import AUVs for HRC in the Thai market show that the factors that contributed to the existence of a PMS in previous periods of review continue to exist during this POR. Saha Thai cites the AUV of Thai HRC imports, stating that AUVs rose from $453.24 per metric ton in 2016 to $658.45 per metric ton in 2018.[40] However, a review of the broader picture of import AUVs shows that the 2016 low for the price of HRC was an outlier and that the overall AUV for HRC in the Thai market has been relatively consistent. For example, in 2014, 2015, and 2017, the AUVs were $678.83 per metric ton, $598.55 per metric ton, and $608.77 per metric ton,

---

[35] *See 2014 Sunset Review*.
[36] *See* Saha Thai's Rebuttal at 18-19.
[37] *See* Saha Thai's Rebuttal at CAP-1.
[38] *Id*. at 28; *see also* Qualitative Submission at Attachment 3.
[39] *See* Quantitative Submission at 9-11.
[40] *See* Saha Thai's Rebuttal at 33.

8

respectively.[41] This shows a pattern of consistent AUVs compared with highs such as $1,046.47 per metric ton in 2013 or $974.94 per metric ton in 2011.[42] Finally, Saha Thai provided its actual costs of acquiring HRC during the POR in its response to a supplemental questionnaire from Commerce.[43] These data are proprietary in nature and cannot be discussed with specificity; however, they confirm that Saha Thai's acquisition cost for HRC is not inconsistent with the AUV comparisons described above for the Thai market as a whole.[44] Therefore, Saha Thai's objection that Commerce must analyze the PMS with regard to actual costs is addressed by this analysis, as well as our analysis of import AUV data specific to this POR. Overall, the consistency of this POR's AUV with the AUVs of periods in which Commerce has previously found a PMS to exist, demonstrate that the factors that contributed to the PMS in the HRC market in the past continued to exist for this POR.

Saha Thai also argues that Thai AD orders and safeguard measures do not create a PMS for this POR.[45] Despite Saha Thai's statements that it paid AD and safeguard duties during the POR at the time of entry, other record evidence demonstrates that Saha Thai is reimbursed for its duty payments in the form of a duty drawback for its exported CWP.[46] Therefore, Saha Thai's statements that it paid some AD or safeguard duties does not detract from Commerce's overall analysis that the non-payment (or reimbursement) of AD or safeguard duties contributes to a PMS in the Thai HRC market. Further, Saha Thai reports that it imported HRC from sources

---

[41] *See* Wheatland's Letter, "Response to Particular Market Situation Supplemental Questions," dated July 23, 2020, at Attachment 5.
[42] *Id.*
[43] *See* Saha Thai's Letter, "Saha Thai's First Supplemental Questionnaire Response," dated March 20, 2020, at Exhibit SR1-1.
[44] *Id.*
[45] *See* Saha Thai's Rebuttal at 34-37.
[46] *See* Saha Thai's Rebuttal at 35; *see also* Saha Thai's Letter, "Saha Thai's Section C Questionnaire Response," dated March 24, 2025, at 34-38; *see also* Saha Thai's Letter, "Saha Thai's First Supplemental Questionnaire Response," dated March 20, 2020, at 8.

9

that were exempted from payment of AD or safeguard duties.[47] Therefore, given that AD or safeguard duties paid by Saha Thai at the time of entry are reimbursed, the GOT's measures to address the price distortions that are caused by global steel overcapacity are not remedied with respect to Saha Thai.

Commerce finds that this evidence, in totality, demonstrates that the prices of domestically sourced and imported HRC in Thailand were distorted during the POR, such that the costs of producing subject merchandise in Thailand were outside the ordinary course of trade. The nature of Saha Thai's costs of producing subject merchandise as outside the ordinary course of trade indicates an extraordinary circumstance that warrants a PMS adjustment.

Commerce further determines that there is sufficient information on the record of this review to estimate the impact of this PMS finding during this POR. To quantify the impact of the PMS, Commerce has calculated an upward adjustment of 8.81 percent to be made limited to where normal value has been calculated based on constructed value, rather than applying the PMS adjustment for the purposes of the sales-below-cost test. Commerce's PMS adjustment is based on Wheatland's Ordinary Least Squares (OLS) regression model that quantifies the relationship between AUVs of imported HRC and uneconomic capacity over ten calendar years ending during the POR.[48]

In its rebuttal comments, Saha Thai raises various concerns with Wheatland's regression analyses. Namely, Saha Thai argues: (1) a globalized regression model is antithetical to an allegation of a localized PMS within Thailand, (2) Wheatland's OLS model results are unsupported by substantial record evidence, (3) a regression analysis based on a minimum 85

---

[47] *See* Saha Thai's Rebuttal at 35.
[48] *See* Wheatland's Letter, "Response to Particular Market Situation Supplemental Questions," dated June 20, 2025 (Revised PMS Calculations), at Exhibit 2.

percent capacity utilization rate is not reasonable, (4) the record demonstrates that Wheatland's regression analysis is incomplete, inaccurate, and unusable, and (4) recent Commerce practice demonstrates that a PMS adjustment to costs is not warranted in this review.[49] Saha Thai proposes alternative regressions and methodologies using revised data covering the same timeframe and alternative assumptions.[50]

As an initial matter, Commerce finds that an 80 percent capacity utilization rate is more appropriate than Wheatland's initially proposed 85 percent capacity utilization rate, consistent with Commerce's practice in other proceedings and the capacity utilization rate identified in reports including Commerce's Section 232 steel investigations.[51] Commerce solicited revised PMS calculations from Wheatland that use an 80 percent capacity utilization rate.[52] While Saha Thai has provided evidence indicating that steel producers may be profitable at capacity utilization rates just under 80 percent, Saha Thai has not proposed an alternative capacity utilization rate on the basis of that information.[53]

Despite Saha Thai's other objections, Commerce quantified the impact of a PMS for HRC in *CWP from Türkiye AR 17-18* on the basis of a similar regression model.[54] Commerce explained in that same administrative review that "the global overcapacity crisis has manifested itself differently in different markets."[55] In its PMS analysis, Commerce has found that while the

---

[49] *See* Saha Thai's Rebuttal at Appendix I.
[50] *Id.*
[51] *See e.g., Certain Oil Country Tubular Goods from the Republic of Kore: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019,* 86 FR 6868 (January 25, 2021), and accompanying PDM; *see also Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Final Results of the 2017-2018 Administrative Review of the Antidumping Duty Order,* 85 FR 3616 (January 22, 2021) (*CWP from Türkiye AR 17-18*), and accompanying IDM at 25.
[52] *See* Commerce's Letter, "PMS Supplemental Questionnaire," dated June 13, 2025; *see also* Revised PMS Calculations.
[53] *See* Saha Thai's Rebuttal at Appendix I.
[54] *See CWP from Türkiye AR 17-18* IDM at Comment 2.
[55] *Id.* at 13.

11

issue of global overcapacity is indeed global in nature, its effects on national HRC markets is country-specific. Indeed, as discussed at length *supra,* the GOT implemented AD orders and safeguard measures to remedy the injury to the Thai steel market caused by global overcapacity. Saha Thai also objects to various explanatory variables, data sources, and time frames used in the regression analysis.[56] While Saha Thai argues that alternative calculation methodologies would yield lower adjustments than Wheatland's methodology, Saha Thai fails to adequately explain why Wheatland's model is unreasonable and why its own methodology would be a preferable method to quantify the PMS that Commerce finds to have existed during this POR. Therefore, Commerce finds that the impact of the global steel overcapacity situation is specific to the Thai market for HRC and can reasonably be quantified for the Thai market using Wheatland's proposed regression model.

### IV. FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order,* Commerce has, as discussed above, revised certain aspects of its dumping analysis. Based on these changes, Commerce determines that the following-weighted average dumping margin exists for the period March 1, 2018, through February 28, 2019:

| Producer and Exporter | Weighted-Average Dumping Margin (percent) |
|---|---|
| Saha Thai Steel Pipe Public Co., Ltd. | 0.00 |

---

[56] *See* Saha Thai's Rebuttal at Appendix I.

Should the Court affirm the final results of redetermination, Commerce intends to publish a *Timken*[57] notice of amended final results in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.[58]

Recoverable Signature

X Abdelali Elouaradia

Signed by: Abdelali Elouaradia

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance

---

[57] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).
[58] *See* Memorandum, "Draft Liquidation Instructions for Final Remand Redetermination," dated July 8, 2025.

13